# 22-2792

## United States Court of Appeals
## for the Second Circuit

STEVEN COOPER,

*Plaintiff-Appellant,*

*against*

CITY OF NEW YORK, DANIEL O'CONNOR, POLICE
LIEUTENANT THOMAS JACOBS, POLICE OFFICER JESSICA
SCHRELL, SHIELD NO. 26482, POLICE DPT SERGEANT
BRENDAN RYAN, NY POLICE OFFICERS JOHN DOES 1-10,
the identity of whom is presently unknown, in their
individual and official capacities as New York City Police
Officers, POLICE SERGEANT ADAM KATRINCIC, CAPTAIN
DESMOND MORALES, POLICE OFFICER NICHOLAS HORUN,
LT. TAX # 90962 STEVEN MONA, POLICE SERGEANT PEARL
BARNHART,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of New York

### BRIEF FOR CITY APPELLEES

RICHARD DEARING
REBECCA L. VISGAITIS
ELINA DRUKER
 *of Counsel*

May 17, 2023

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for City Appellees
100 Church Street
New York, New York 10007
212-356-2609 or -0858
edruker@law.nyc.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .........................................................................iii

PRELIMINARY STATEMENT ..............................................................1

ISSUES PRESENTED FOR REVIEW ...................................................2

STATEMENT OF THE CASE ................................................................2

    A.  The unprovoked attack on Cooper, leading to his arrest
        and prosecution ..........................................................................2

    B.  Cooper's lawsuit against his attackers and the police
        officers involved in his arrest .................................................13

SUMMARY OF ARGUMENT .................................................................16

ARGUMENT .............................................................................................18

POINT I .....................................................................................................18

    COOPER'S FALSE-ARREST CLAIMS FAIL AS A MATTER
    OF LAW .............................................................................................18

    A.  Jacobs was not acting under color of law when he beat up
        Cooper or when he falsely accused Cooper of punching
        him in the face. .........................................................................18

    B.  Cooper's respondeat superior claim against the City fails
        because Jacobs was not acting within the scope of his
        employment. .............................................................................26

    C.  The on-duty NYPD officers had probable cause to arrest
        Cooper, defeating his federal- and state-law false-arrest
        claims against them ..................................................................29

## TABLE OF CONTENTS (cont'd)

**Page**

POINT II ..................................................................... 35

    COOPER'S CONSPIRACY CLAIMS FAIL AS A MATTER
    OF LAW ................................................................. 35

CONCLUSION ......................................................... 39

CERTIFICATE OF COMPLIANCE ....................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashley v. City of N.Y.*,
    992 F.3d 128 (2d Cir. 2021) ................................................................. 30

*Berg v. Kelly*,
    897 F.3d 99 (2d Cir. 2018) .................................................................. 34

*Bonsignore v. City of N.Y.*,
    683 F.2d 635 (2d Cir. 1982) ............................................................... 21

*Brinn v. Syosset Pub. Library*,
    624 F. App'x 47 (2d Cir. 2015) ........................................................... 16

*Chiaro v. Cnty. of Nassau*,
    488 F. App'x 518 (2d Cir. 2012) ......................................................... 22

*Ciambriello v. Cnty. of Nassau*,
    292 F.3d 307 (2d Cir. 2002) ............................................................... 37

*Combier v. Portelos*,
    788 F. App'x 774 (2d Cir. 2019) ....................................... 19, 20, 21, 26

*Curley v. Village of Suffern*,
    268 F.3d 65 (2d Cir. 2001) ................................................................. 31

*Davis v. City of N.Y.*,
    226 A.D.2d 271 (1st Dep't 1996) ............................................ 27, 28, 29

*Debrosse v. City of N.Y.*,
    739 F. App'x 48 (2d Cir. 2018) ........................................................... 20

*Devenpeck v. Alford*,
    543 U.S. 146 (2004) ............................................................................ 34

*District of Columbia v. Wesby*,
    138 S. Ct. 577 (2018) .................................................................. 30, 33

iii

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Droz v. McCadden,*
  580 F.3d 106 (2d Cir. 2009) .................................................. 38

*Ginsberg v. Healey Car & Truck Leasing, Inc.,*
  189 F.3d 268 (2d Cir. 1999) ................................... 22, 23, 24

*Guan v. City of N.Y.,*
  37 F.4th 797 (2d Cir. 2022) ........................................... 30, 31

*Hartline v. Gallo,*
  546 F.3d 95 (2d Cir. 2008) .................................................. 36

*Jaegly v. Couch,*
  439 F.3d 149 (2d Cir. 2006) .............................................. 34

*Jocks v. Tavernier,*
  316 F.3d 128 (2d Cir. 2003) ........................................ 23, 33

*Kaley v. United States,*
  571 U.S. 320 (2014) .......................................................... 30

*Linda R. S. v. Richard D.,*
  410 U.S. 614 (1973) .......................................................... 38

*Monell v. Dep't of Soc. Servs.,*
  436 U.S. 658 (1978) .......................................................... 27

*Murphy v. City of Stamford,*
  634 F. App'x 804 (2d Cir. 2015) ...................................... 36

*N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. ___ (2022) .......................................................... 21

*Overby v. Fabian,*
  No. 17-CV-3377 (CS), 2018 U.S. Dist. LEXIS 114525
  (S.D.N.Y. July 10, 2018) .................................................... 39

iv

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Pitchell v. Callan,*
13 F.3d 545 (2d Cir. 1994) ................................................. 19

*Schilt v. N.Y.C. Transit Auth.,*
304 A.D.2d 189 (1st Dep't 2003) .................................... 27, 28

*Segal v. City of N.Y.,*
459 F.3d 207 (2d Cir. 2006) .............................................. 27

*Singer v. Fulton Cnty. Sheriff,*
63 F.3d 110 (2d Cir. 1995) ............................................ 36, 38

*Stansbury v. Wertman,*
721 F.3d 84 (2d Cir. 2013) ................................................ 31

*Stavitz v. New York,*
98 A.D.2d 529 (1st Dep't 1984) ...................................... 28, 29

*Thompson v. Grey,*
385 F. App'x 54 (2d Cir. 2010) .......................................... 38

*United States v. Gagnon,*
373 F.3d 230 (2d Cir. 2004) .............................................. 32

*Whren v. United States,*
517 U.S. 806 (1996) ........................................................ 32

**Statutes**

42 U.S.C. § 1983 .......................................................... *passim*

New York Penal Law § 145.00(1) ........................................ 31

New York Penal Law § 221.05 (1977) (*repealed* by Local Law
2021 ch. 92, § 15) ......................................................... 34

New York Penal Law § 240.26(1) ........................................ 31

## PRELIMINARY STATEMENT

The plaintiff in this false-arrest case, Steven Cooper, alleges that he was the victim of an unprovoked attack by two men, including off-duty NYPD officer Thomas Jacobs. When police arrived on the scene, Cooper accused the men of attacking him, while they accused Cooper of punching Jacobs as he tried to break up an argument. Both Cooper and Jacobs had visible injuries. The police brought all three to the station and later formally arrested Cooper and the other man, but not Jacobs. Cooper alleges that he was falsely accused by Jacobs, acting under color of law, and that police and Jacobs conspired to falsely arrest him.

In two decisions that this Court should affirm, the district court denied leave to replead some claims (Garaufis, J.) and granted summary judgment to the defendants on others (Kovner, J.), finding that Jacobs did not act under color of state law; that police had probable cause to arrest Cooper based on Jacobs' accusations; and that there was no underlying constitutional violation, defeating his § 1983 conspiracy claim. There is no triable question: Jacobs was on a personal pursuit, and his accusations that there was no objective reason to disbelieve, plus his visible injuries, gave rise to probable cause to arrest Cooper.

## ISSUES PRESENTED FOR REVIEW

Did the district court correctly deny leave to replead and grant summary judgment on plaintiff's claims asserting (1) false arrest against an off-duty NYPD officer, the City of New York, as his employer, and other NYPD officers and (2) conspiracy, where officer did not act under color of law or in the scope of his employment, and the arrest was supported by probable cause?

## STATEMENT OF THE CASE

The following facts are taken from the depositions and videos, and, where disputed, are presented in the light most favorable to plaintiff-appellant, the non-moving party.

### A. The unprovoked attack on Cooper, leading to his arrest and prosecution

According to Steven Cooper, one afternoon in March 2016, as he was crossing a street in Williamsburg, Brooklyn, a car drove through a stop sign and hit his right side (JA246-47, 422, 653-54). He "very nicely" said "I guess you didn't see the stop sign" (JA454, 655). Although the car's windows were all completely closed (JA656, 659), the car stopped and the four or five adult men inside stuck up their middle fingers in unison (JA426, 454, 656).

2

Next, a man "three times the size" of Cooper with "tattoos all up and down their neck" got out of the car (JA656-66), followed by the driver who exited through the passenger side door (JA733). Cooper fled (JA292, 423, 731). The large man, later identified as Daniel O'Connor—a civilian, chased after Cooper, slammed Cooper's head with the palm of his hand from behind, and choked him by his sweatshirt hood (JA662-65, 735).

In his deposition, Cooper testified that a second, smaller man, later identified as Thomas Jacobs, an off-duty NYPD officer who was not in uniform, came from behind O'Connor, body checked Cooper "like a linebacker" and pushed him several times (JA662-67, 704, 740)—without causing "any direct injury" (JA670). Cooper felt what he thought was a gun under Jacobs' jacket, though he never saw it, and Jacobs said "You want to get shot? Get out of here" (JA455, 666, 704-05, 738043). He "concealed the fact that he is a law enforcement officer" (JA7, 31). To give himself time to get away, Cooper contends that he "swiped" Jacobs' glasses off his face to distract him, without making any contact with Jacobs himself, and then turned and ran (JA670-71, 707-08, 747). Jacobs' glasses were broken (JA800).

3

Two surveillance videos that Cooper was able to obtain by inquiring with local business owners show this brief encounter. A video, labeled "Intersection Altercation" by Cooper, shows him at a crosswalk with O'Connor and Jacobs following him (JA429, Ex. 22 at 4:04:08 p.m.).[1] O'Connor comes from behind Cooper and grabs his sweatshirt hood and holds onto it for several seconds (*id*. at 4:04:09-4:04:18). Jacobs steps between Cooper and O'Connor, raises his right arm and twice pushes Cooper back, forcing Cooper to retreat several steps with each push (*id*. at 4:04:22-4:04:29). The video does not appear to show Jacobs "bodycheck" Cooper with his side, as Cooper testified.

A split-second later, Cooper raises his hand and seems to strike Jacobs in the face; Jacobs recoils, turns his head to the left, and lifts his hand to straighten his baseball cap that appears to have been knocked askew (*id*. at 4:04:30-4:04:30:39 p.m.). Cooper contends that he did not make contact with Jacobs, but only his glasses (JA670-71). Cooper then flees, and O'Connor and Jacobs chase after him (*id*. at 4:04:31 p.m.). During this chase, Cooper drops his hat, which Jacobs tries to scoop up

---

[1] The time stamp is a banner on the top of the video.

while running, but he falls (*id.* at 4:04:39-4:04:42 p.m.). According to Cooper, that is when Jacobs must have injured his face.

Another video, entitled "Intersection Facing West," shows the encounter from a different angle. A lamppost blocks the view of the altercation in the crosswalk, but it does show Jacobs run, stumble and fall when picking up Cooper's hat, and then get back up and start walking (JA429, Ex. 22 at 1:24-28). Jacobs testified that he threw the hat away as he was walking. He explained that he had picked up the hat out of "police instinct" and threw it because he was "still stunned, and not thinking clearly, and it was clearly out of frustration" (JA615).

According to Cooper, he stopped a few blocks later and called 911. While he was on the phone with the emergency operator, O'Connor and Jacobs caught up with him and started beating him and punching him about the face between 10 and 20 times (JA673, 677-78).

The 911 call speaks for itself (JA429, Ex. 16). Cooper calls to report an attempted robbery. At around 1:22 of the audio recording, Cooper says: "I think I know where they might be right now, to tell you the truth, so we could get them, ok, and usually that's the job that you guys wanna do. You want to catch the perpetrator. Well, I know where exactly they

5

are." The operator asks him to describe the perpetrators and he says: "one was definitely a mixed breed, one was a white boy, and I don't know, there was another one in the car. The car was a silver car…" and then, at 1:44 of the audio recording, Cooper is interrupted, and shouting can be heard in the background. He starts speaking again fifteen seconds later: "Yo, the guy is right here. I hope the police are close … he punched me in the face."

The 911 operator sent a radio dispatch to officers in the area, to which NYPD Officers Nicholas Horun and Jessica Schrell responded (JA247). Cooper told the officers that he had been attacked by four men (JA311). Officers Horun and Schrell invited Cooper into their car to canvass the area for his assailants (JA309-10). Officer Schrell reported that, while canvassing, Cooper was "yelling that he had been jumped" and "robbed" and "was really hyper" (JA309-10). At some point, Officer Horun told Cooper to "shut the f*** up" (JA293, 680).

Cooper identified four men—active NYPD Lieutenant Jacobs, the civilian O'Connor, retired NYPD Officer Steven Mona, and another civilian—on a sidewalk. According to the officers, Cooper reported that the "big guy," later identified as O'Connor, had punched him in the face

(JA248, 314-16, 327).[2] Cooper testified that he got out of the car on the roadway side, with the car between himself and the officers, who told him to stay away and "back up." (JA683, 758). From that distance, he saw Jacobs take something out of his wallet and heard him say, "I'm on the job" (JA683). The officers testified that Jacobs immediately identified himself as an off-duty NYPD officer (JA294, 314-15, 329). He told Officer Schrell that Cooper—who the officers testified was still in the police car— had struck him in the face (JA248, 380).

A supervisor, Sergeant Adam Katrincic arrived on the scene and spoke with both Cooper and Jacobs (JA339-40). Cooper identified the "tall guy with tattoos"—O'Connor—as the person who had punched him in the face (JA339). Jacobs reported that he had punched Cooper, but only after Cooper had struck him (JA340, 527-). Jacobs and Cooper both had visible injuries to their faces, and Jacobs had an abrasion on his knee (JA342, 392-93). Upon learning that Jacobs was an off-duty officer, Katrincic contacted the NYPD's Internal Affairs Bureau (IAB) and reported that

---

[2] According to Jacobs, O'Connor is roughly 6'6" and Cooper is about 5'10" (JA569). Cooper likewise estimated that O'Connor is roughly 6'6" (JA661).

Cooper had struck Jacobs, Jacobs had struck Cooper, and they both have "bruises to the face" (JA248, 529).

Sergeant Katrincic asked everyone to go to the precinct to talk with IAB, and one of the officers told Cooper he was not free to leave (JA295, 908). According to Cooper, he asked if he was being arrested, and the sergeant told him "no" and said, "I'm sorry, you need to come to the precinct because there was an officer involved and you need to speak to IAB" (JA685-86). Cooper testified that he felt coerced, but that he agreed to go to the precinct because, "at that time," he wanted to speak to IAB, "tell them exactly what happened," and "make sure that [his] voice was heard" (JA687).

When he arrived at the precinct, Cooper admitted to possessing marijuana, which he relinquished to an officer (JA77, 82, 295-96, 394). Captain Desmond Morales interviewed Cooper, Jacobs, and the officers who arrived on the scene in response to Cooper's 911 call. Cooper reported that "the lieutenant" had punched him (JA353, 932). He explained at his deposition that he hadn't wanted to talk to the captain because he was afraid the police would retaliate against him; he spoke only briefly to the captain and did not "tell him the full extent of the whole story" including

8

how they struck him with a car, chased him, attacked him again (JA689-90). He reiterated that he "only gave him part of the story" and was waiting to speak to "higher-ups" (JA690-91). Cooper did not see Jacobs at the station; the last time he saw Jacobs was on the street after the incident (JA763).

For his part, Jacobs spoke extensively with police at the station, and reported that Cooper had thrown something at the car, prompting O'Connor to get out and confront him (R345, 606). He explained that he was trying to diffuse the situation when Cooper punched him hard in the face (R529).

Captain Morales prepared a report for IAB, which concluded, "[t]hrough interviewing all parties involved the Officers determined that this was a dispute and not a robbery attempt" (JA381). The report detailed that Cooper was crossing the exit ramp of the Williamsburg Bridge and "was upset that the vehicle didn't yield to him as a pedestrian," "may have thrown an unknown object at the vehicle," and that, in response, Mona, the driver, stopped the vehicle and, O'Connor, one of the passengers, got out and "began to argue" with Cooper (JA381). Jacobs next got out and "separated the two and Mr. Cooper struck Lt.

9

Jacobs knocking off his eyeglasses causing a red welt on the right side of his face" (JA381). "Mr. Cooper fled and was stopped by Mr. O'Connor a short distance away where Mr. O'Connor then struck Mr. Cooper causing a bruise to his left eye" (JA383). The report recounted that both Jacobs and Cooper were seen by EMS and refused further medical attention (JA382)

Cooper emphasizes several inconsistencies in the police paperwork and alleged irregularities in the investigation.

*First*, while officers initially reported to IAB that Jacobs had struck Cooper, paperwork prepared at the precinct omits this detail. Captain Morales explained that while he knew that Cooper had accused Jacobs of hitting him, he omitted this from the paperwork because he'd concluded that it had been O'Connor who had punched Cooper, not Jacobs (JA249, 354).

*Second*, Morales' report to IAB omitted the fact that Cooper was visibly injured, although an Aided Card and the Command Log both document that Cooper had redness, bruising, and swelling to the face (JA392).

10

*Third*, Cooper disputes the police officers' claim that a team from NYPD conducted a "video canvass," meaning they went to the area and looked for NYPD or private cameras that may have captured the incident (JA408-10). They reported that their canvass "yielded negative results" (*Id.*). Cooper was later able to locate the video footage that is in evidence (JA449).

*Finally*, on a Supervisor's Fitness for Duty Report, Sergeant Katrincic checked a box indicating that Jacobs was "armed" (JA472), while other records reflect Jacobs was unarmed or left that box unchecked (JA575, 473). Captain Morales's IAB report states that Jacobs was not armed (R382). Jacobs denied that he was armed, explaining that he had attended a concert the night before at Irving Plaza and had stayed the night in a rental apartment with O'Connor, so decided against bringing a gun; he left his four firearms in his locker at work (JA606, 630, 809). Sergeant Katrincic testified that he called and confirmed with Jacobs' precinct that all four of his firearms were in his locker (JA925). Katrincic explained that he made a mistake when he recorded on a single form that Jacobs was armed; he explained that he was simply thinking that, as an off-duty officer, "he's permitted to carry weapons" (JA925). In

11

his IAB testimony, Katrincic similarly explained "I made a mistake on here, he was not, I had marked off armed here. He was unarmed at the time" and recounted that he had "call[ed Jacobs'] command to find out where his guns were. They were all in his locker" (JA597).

Cooper and O'Connor were both charged with assault. Jacobs filled out a supporting deposition in which he swore under penalty of perjury that Cooper had punched him in the face causing substantial pain, fear, and alarm (JA60-61, 84-85). The charges against Cooper were dismissed after he obtained surveillance footage from the area showing that O'Connor and Jacobs had instigated the fight.

O'Connor was arrested for assault at the 90th precinct (JA951). He later pled guilty to disorderly conduct (JA442).

Jacobs was not charged, although the police department did discipline him in connection with this incident—he forfeited 15 vacation days as part of a negotiated settlement of three charges that "while off-duty," he was involved in a personal physical altercation, failed to request the response of the Patrol Supervisor, and discarded another person's personal property without permission (JA1154, 1156). He also requested paid time off for injuries sustained that day, but that request was denied

12

(JA461). Although it was Jacobs' day off and he was off-duty at the time, he applied for overtime compensation for that day (JA778-80).

### B. Cooper's lawsuit against his attackers and the police officers involved in his arrest

Cooper brought this suit against his two assailants, the officers who responded to the scene and who were involved at the precinct, and the City for various federal and state-law force- and arrest- based claims, as well as a claim for larceny (JA1-24, 25-58). He alleged in his first amended complaint that Jacobs, though off-duty, acted under color of law. He also brought a libel claim against then-Deputy Commissioner of Public Information Sergeant Brendan Ryan in connection with a New York Post article (JA58).[3]

The District Court for the Eastern District of the New York (Garaufis, J.) dismissed Cooper's first amended complaint with leave to replead (JA91-114). Cooper filed a motion for permission to file a second

---

[3] In the 1990s, O'Connor had been a member of the hip-hop trio House of Pain, which made this incident the subject of media interest. In response to a press inquiry, Sergeant Ryan released information from police paperwork to a journalist employed by the New York Post (R371-72), who reported that during an altercation between Cooper and O'Connor, Cooper had hit Jacobs, an off-duty officer (JA58)—which Cooper maintains was false. On appeal, Cooper has abandoned his claims against Ryan (Appellant's Brief at 3 n.2).

amended complaint to allege, in more detail, substantially the same claims (JA116-56), including a kitchen sink of claims: federal false imprisonment (JA131-36), federal and state false arrest (JA136-37, 150-51), federal and state malicious prosecution (JA137-39, 151-53), federal "deprivation of rights" (JA139-41), federal excessive force against all officers (JA141), supervisory and municipal liability against the City (JA141-44), conspiracy to deprive plaintiff of his constitutional rights (JA144-47), and state law claims for assault and battery against O'Connor and Jacobs (JA147-49), prima facie tort and state constitutional claims against all defendants (JA149, 150), libel and slander against Sergeant Ryan (JA149-50), intentional and negligent infliction of emotional distress against all defendants (JA153-54), and larceny against Jacobs for taking Cooper's hat (JA154).

In a detailed and thorough 42-page decision, Judge Garaufis denied leave to replead on futility grounds, except with respect to Cooper's federal false-arrest, false-imprisonment, and conspiracy claims against Officers Schrell, Horun, Katrincic, Morales, Barnhart, and John Doe defendants; parallel state-law false-arrest claims against Officer Schrell and the City; state-law assault and battery claims against O'Connor and

14

Jacobs; and state-law libel and slander claim against Sergeant Ryan (Special Appendix ("SPA") 42). The court determined that Jacobs did not act under color of law because he was off duty, out of uniform, not carrying handcuffs, did not identify himself as an officer or show his badge to Cooper, and did not arrest or detain Cooper, so denied leave to replead state or federal claims against him based on his participation in Cooper's arrest (SPA17-19, 35).

Defendants Jacobs (JA198-204), O'Connor (JA205-12) and the City defendants (JA212-227, 228-43) answered. Following discovery, the defendants moved for summary judgment (JA243).

The district court (Kovner, J.) granted summary judgment on all remaining federal claims in defendants' favor (SPA43-58). The court granted summary judgment to the City defendants on Cooper's federal arrest-based claims and related conspiracy claim because Cooper's arrest was supported by probable cause, and resolved his parallel state-law

15

false-arrest claim on the same basis (SPA49-53, 57).[4] The court declined to exercise supplemental jurisdiction over his remaining state-law claims (SPA57).

## SUMMARY OF ARGUMENT

The district court's denial of leave to replead on futility grounds and grant of summary judgment are each reviewed *de novo. Brinn v. Syosset Pub. Library*, 624 F. App'x 47, 48 (2d Cir. 2015). Applying that standard of review, this Court should affirm both orders on appeal.

*First,* Cooper's federal false-arrest and false-imprisonment claims were correctly disposed of by the district court. Because Jacobs acted as a private citizen, not an officer acting under color of law, the district court correctly denied Cooper permission to allege a federal arrest-based claim against him under 42 U.S.C. § 1983. Jacobs was off duty, out of uniform, not carrying handcuffs, and did not detain or arrest Cooper after attacking him. He reported—apparently falsely—that he and not Cooper

---

[4] Judge Garaufis had previously explained that the state and federal false-arrest claims are substantially similar, except for statute-of-limitations purposes—so allowed Cooper to proceed on his state-law claims against Officer Schrell, John Doe defendants, and the City, but not the other officers who were only named after the expiration of the limitations period (SPA35). The court had also denied Cooper leave to replead a state-law false-arrest claim against Jacobs for the same reasons it denied leave to replead a federal-law false-arrest claim against him—that he was not involved in the arrest in his capacity as a police officer (SPA35).

was the victim of an unjustified attack, acting as a complaining victim, not as a police officer.

Likewise, in denying leave to replead state-law false-arrest claims against the City on a theory of respondeat superior based on Officer Jacobs' conduct, the district court correctly found that Jacobs was not acting in his capacity as a police officer in connection with Cooper's arrest. Even if Cooper had been allowed to plead that claim, the City would be entitled to dismissal because Jacobs did not act within the scope of his employment for much the same reasons that he did not act under color of law for purposes of the federal claims: he was off duty and on a personal pursuit when he attacked Cooper and then lied about it.

What's more, the district court correctly found that, on the merits, Cooper's false-arrest claims fail. Because Jacobs' accusations against Cooper, although evidently false, appeared objectively credible at the time, they gave rise to probable cause for Cooper's arrest—which provides a complete defense to Cooper's claims against the City defendants. Cooper has pointed to no objective reason known to officers at the time of his arrest that should have led them to disbelieve Jacobs. Surveillance evidence that later came to light undermining Jacobs'

account does not change that the objective facts at the time of arrest reasonably supported the conclusion that Cooper had assaulted Jacobs, defeating his federal and state false-arrest claims against the NYPD officers, and against the City on a theory of respondeat superior.

*Second*, Cooper's conspiracy theory fails at every turn. He has not adduced evidence suggesting there was an agreement between police and Jacobs to falsely arrest him. Nor has he raised a triable question that he even experienced a constitutional violation, let alone that defendants caused it to further their conspiracy. This Court should affirm.

## ARGUMENT

### POINT I

### COOPER'S FALSE-ARREST CLAIMS FAIL AS A MATTER OF LAW

**A.   Jacobs was not acting under color of law when he beat up Cooper or when he falsely accused Cooper of punching him in the face.**

The district court correctly found that Cooper could not maintain a federal false-arrest claim against Jacobs. A claim based on a deprivation of federal or Constitutional rights under 42 U.S.C. § 1983 can only be maintained if the conduct complained of was committed by a person

18

acting "under color of state law." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).

A § 1983 claim is not available if a police officer causes a constitutional violation while engaged in "personal pursuits." *Id*. In deciding if an officer was engaged in personal pursuits, the officer's status as on- or off-duty is not determinative. *Id*. at 548. Instead, courts consider "the nature of the officer's act." *Id*. A § 1983 claim can be asserted if an off-duty officer "invokes the real or apparent power of the police department" or "perform[s] duties prescribed generally for police officers"—that is, acts under the pretense of law. *Id*.

Applying these guideposts, this Court found in *Pitchell* that a drunken off-duty officer who shot a house guest over a political disagreement without invoking the authority of the police department was not acting under color of law even though he was partly in uniform, was known by the victim to be an officer, and used department-issued bullets. *Id*. When the officer "violated the law, he did so as a private citizen, not as a state actor." *Id*.

Nor is a public employee's use of work-issued equipment, nor even the commission of the tort during work hours dispositive. *Combier v.*

19

*Portelos*, 788 F. App'x 774, 778 (2d Cir. 2019). Thus, this Court has held that public employees who hacked a private individual's blog and spread misinformation about her, defaming her and harming her business, did not act under color of law because they did not undertake any "actual or pretended duty" or "cloak" themselves in their employer's authority, even though they committed the tort during work hours and using work-issued computers. *Id.*

Cooper's § 1983 claim against Jacobs fails under these precedents. At the outset, he seemingly concedes that Jacobs was not acting under color of law during the attack (Appellant's Br. 21 n.4), if not at the time that he described Cooper's actions to the police. Nonetheless, Cooper spills much ink emphasizing that he felt a hard object in Jacobs' pocket that he never actually saw, but which he believes must have been a firearm. The record evidence refutes this bit of sheer speculation (JA382, 472-73, 575, 597, 606, 630, 809, 925), which is insufficient to create a genuine issue of fact. *Debrosse v. City of N.Y.*, 739 F. App'x 48, 51 (2d Cir. 2018) ("conclusory, speculative allegations … unsupported by admissible evidence in the record" cannot create a genuine issue of material fact).

Even if there were a genuine dispute about whether Jacobs was armed, possession of concealed firearms is not restricted to law enforcement officers, *N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ___ (2022), so this fact is immaterial to either Cooper's abandoned excessive-force claim or the false-arrest claim he seeks to resuscitate on appeal. Even assuming that Jacobs had been armed and carrying a service weapon that he never brandished or displayed, that would not be enough for a jury to find that he was acting under color of law when he pushed and punched Cooper over a private dispute or later identified him as his attacker. *Bonsignore v. City of N.Y.*, 683 F.2d 635 (2d Cir. 1982) (holding off-duty officer who used his service weapon did not act under color of law); *Combier*, 788 F. App'x at 778 (use of work computer to commit the tort did not establish that public employees acted under color of law).

Next, in an internally inconsistent argument, Cooper abandons his own testimony alleging an unprovoked attack and instead adopts Jacobs' version of the events—under which Jacobs, acting like a police officer, tried to break up a fight (App. Br. 19-20). Because Cooper is the non-moving party, the Court should credit his account instead at this

juncture. He testified that, in a fit of road rage, Jacobs attacked him, did not identify himself as an officer, "bodychecked" Cooper, repeatedly pushed him, and once Cooper fled, chased him down and then punched him about the head, before running away. If, instead, Jacobs' account of intervening to stop a fight between Cooper and O'Connor were accepted as true, it might be a closer question whether Jacobs acted under color of law, but under that alternate set of facts—where Jacobs was attempting to diffuse the situation and in response Cooper hit him or flicked off his glasses, breaking them—Cooper would still have no cognizable false-arrest claim, *see infra* Point I.C.

Nor is there any merit to Cooper's main argument: that after police officers arrived on the scene in response to his 911 call, Jacobs identified himself as an off-duty NYPD officer to the other officers and then falsely accused Cooper of punching him in the face, effectively clocking in to work (App. Br. 20). Jacobs' actions—identifying a person as his attacker—is not law enforcement conduct, but the behavior of a "private citizen." *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999) (providing information to the police does not make an individual a state actor); *Chiaro v. Cnty. of Nassau*, 488 F. App'x 518, 519 (2d Cir.

22

2012) (affirming district court's finding that an off-duty officer involved in a family dispute who falsely recounted "his account of the incident to the Suffolk County Police," leading to the plaintiff's arrest, was not "exercising of official duties," *see* 2011 U.S. Dist. LEXIS 94229, at *10 (E.D.N.Y. July 29, 2011)).

On this point, Cooper's own testimony defeats any claim that Jacobs was acting under color of law. He admits that Jacobs did not identify himself to Cooper as an officer or attempt to arrest or detain Cooper after the attack. Instead, Jacobs fled the scene. *Compare Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003) (off-duty officer who "identified himself as a police officer, physically seized Jocks, transported him into the gas station office at gunpoint, and detained him until the Nassau County Police arrived" acted under color of law). And when police approached the group of suspected attackers, Jacobs did not seek Cooper's arrest, but merely identified him as a person with whom he and his friend had fought. *Ginsberg*, 189 F.3d at 272.

Consider, in sharp contrast, the facts in *Rivera v. La Porte*, in which an off-duty corrections officer got into a fight with the plaintiff over a traffic dispute. 896 F.2d 691, 692 (2d Cir. 1990). The plaintiff repeatedly

asked the off-duty officer to move his van, which was blocking traffic; the officer got out of the van, kicked him, struck him in head, jumped on top of him, yelled "I'm a police officer, you're under arrest," and handcuffed him. *Id.* at 692. When police arrived, the off-duty officer placed the plaintiff in the police car, accompanied him throughout the evening to the local precinct, where he was questioned in the officer's presence, to the hospital, and to central booking. *Id.* This Court explained that "[t]hough the dispute that precipitated the arrest was private, the response, including the arrest and the use of excessive force, was unquestionably action under color of law." *Id.* at 696.

Here, unlike in *Rivera*, Jacobs fled after attacking Cooper. He did not identify himself as an officer or attempt to detain Cooper, speak to him, or handcuff him. And, when police approached the group of Cooper's attackers, Jacobs did not invoke his authority and demand Cooper's arrest, nor did he escort Cooper to the precinct or partake in any interrogation. Arresting officers described Jacobs as the "C/V"—complaining victim—in their paperwork (JA73, 77). After the on-street identification, Cooper did not see Jacobs again.

24

Nor were Jacobs' actions at the precinct—continuing to lie about Cooper's actions and swearing to those lies in a charging instrument—done under color of law. Jacobs was taken to the precinct because he admitted to having exchanged blows with Cooper and was thus the subject of an IAB investigation. As a result of that investigation, the police department charged Jacobs with misconduct including "while off-duty … [being] involved in a personal physical altercation" and "while off-duty" … discard[ing] another person's personal property without permission" (JA1154). Jacobs forfeited 15 vacation days as a penalty (JA1156). He was not at the station in his capacity as an arresting officer, but as the target of an IAB investigation into misconduct.

For this reason, the fact that Jacobs was paid overtime does not create a triable question of about whether he acted under color of law when falsely accusing Cooper of assault. He applied for overtime through the City's automated time tracking system "because of the investigation that's relating to the incident involving Steven Cooper" (JA778, 780-81). Notably, he also applied for line-of-duty sick leave based on injuries from this incident, which were "disapproved" because the police department "determined that this injury was not sustained during the course of police

service," a determination that was upheld on an administrative appeal (JA815-17). To the extent he was at the station in any professional capacity as an officer, it was not as an arresting officer performing his official duties. *Combier*, 788 F. App'x at 778 (private tort committed during work hours not done under color of law).

On these facts, no reasonable juror could find that Jacobs was acting "under color of law" in connection with Cooper's attack and arrest. Jacobs' false accusation to the police, "though it may be a tort, is not actionable under § 1983." *Combier*, 788 F. App'x at 778.

**B. Cooper's respondeat superior claim against the City fails because Jacobs was not acting within the scope of his employment.**

The district court also correctly dismissed Cooper's state-law respondeat superior claim against the City premised on Jacobs' conduct (SA35). Under state law, Jacobs might be liable for the common-law tort of false arrest in his non-official capacity. But Cooper cannot hold the City liable as Jacobs' employer for his part in Cooper's arrest, as Cooper

urges on appeal (App. Br. 21-24), because Jacobs was not acting within the scope of his employment.[5]

Cooper's respondeat superior claim is meritless for many of the same reasons that Jacobs did not act under color of state law for purposes of § 1983, *see supra* Point I.A. Under state law, "when a plaintiff invokes the doctrine of respondeat superior, the plaintiff has the burden of establishing … that the act complained of occurred while the defendant's employee was acting within the scope of his employment with the City of New York." *Davis v. City of N.Y.*, 226 A.D.2d 271, 271-72 (1st Dep't 1996). New York courts have explained that the inquiry turns on whether the employee was "acting wholly in furtherance of their own personal interests" or "performing such actions is to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business." *Schilt v. N.Y.C. Transit Auth.*, 304 A.D.2d 189, 193 (1st Dep't 2003) (internal quotation marks omitted).

---

[5] Cooper has abandoned any federal claims against the City under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), for good reason: he never even gestured to any official municipal policy or custom that caused a constitutional deprivation. Also, because there is no underlying constitutional violation, there can be no separate cause of action under *Monell* against the City. *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006).

Under state law, an off-duty officer's assault of another person as part of a personal dispute is consistently held to be outside the scope of employment. "[W]here an employee's conduct is brought on by a matter wholly personal in nature, the source of which is not job related, his actions cannot be said to fall within the scope of his employment." *Davis*, 226 A.D.2d at 272 (internal quotation marks omitted); *Stavitz v. New York*, 98 A.D.2d 529, 531-32 (1st Dep't 1984) ("actions so dictated by personal motives and so divorced from the employee's work as not to be incidental to the performance of his duties … lie beyond the scope of employment").

What's more, once an off-duty officer has attacked another person for personal reasons, the officer's "brief display of their badges, without more, is simply insufficient to create a triable issue of fact as to whether they were acting within the scope of their employment." *Schilt*, 304 A.D.2d at 195. Action within the scope of employment for state-law purposes is thus narrower than action under color of law for the purpose of section 1983. Indeed, courts have held that even if the officer then goes on to arrest the person they attacked, this does not render City liability under state-law respondeat superior.

28

In *Davis*, for instance, the court found that the fact that the off-duty officer who attacked the plaintiff also arrested him was "irrelevant," because the officer's actions—attacking the plaintiff after becoming angry because the plaintiff had cut in front of the officer at line at a McDonald's restaurant—were "dictated solely by personal motives." 226 A.D.2d at 272. Likewise, in *Stavitz*, a court found that an off-duty officer who assaulted his neighbors over a private dispute, and then "returned, displayed his police shield and placed both plaintiffs under arrest" had not acted in the scope of his employment, because he acted on "personal motives." *Stavitz*, 98 A.D.2d at 532.

Under these precedents, Cooper's state-law respondent superior claims based on Jacobs' physical attack on Cooper and subsequent lies leading to his arrest would fail. There is no triable question as to whether Jacobs acted purely for personal motives when he attacked Cooper and lied about it—he plainly did, *see supra* Point I.A.

## C. The on-duty NYPD officers had probable cause to arrest Cooper, defeating his federal- and state-law false-arrest claims against them.

The district court also correctly granted summary judgment to the individual City defendants on Cooper's federal false-arrest and false-

imprisonment claims and his state-law false-arrest claim because the record establishes that there was at least arguable probable cause to arrest Cooper both for assaulting Jacobs and for possessing marijuana (SPA7, 15).

Probable cause is a complete defense to Cooper's state and federal false-arrest claims. *See Ashley v. City of N.Y.*, 992 F.3d 128, 136 (2d Cir. 2021). Even if there was not probable cause, police officers are entitled to qualified immunity if their actions did not violate clearly established law or there was *arguable* probable cause at the time of arrest. *Guan v. City of N.Y.*, 37 F.4th 797, 806 (2d Cir. 2022).

The probable cause standard does not set "a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). It exists when the totality of the objective facts known to the officer at the time of arrest and immediately before are sufficient to warrant a person of "reasonable caution" to conclude that the person to be arrested committed a crime. *Ashley*, 992 F.3d at 136. As the very name suggests, it deals with probabilities. *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018). Arguable probable cause exists "if officers of reasonable competence could disagree about whether the probable cause test was met." *Guan*, 37 F.4th at 806.

30

In other words, the question is whether *any* reasonable officer assessing the facts might have concluded that probable cause existed. *Id.*

Here, it is undisputed that before police arrested Cooper, accusations were made by all sides: Jacobs accused Cooper of punching or shoving him, and Cooper accused both Jacobs and O'Connor of punching, shoving, and attempting to rob him. Both O'Connor and Jacobs had visible injuries, and Jacobs' glasses were broken. "When information is received from a putative victim or an eyewitness, probable cause exists … unless the circumstances raise doubt as to the person's veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001); *Stansbury v. Wertman*, 721 F.3d 84, 90 (2d Cir. 2013). Because there was no objective reason to disbelieve Jacobs, there was probable cause to arrest all three under New York Penal Law § 240.26(1), which makes it a crime to "shove… or otherwise subject[]" a person to physical contact "with intent to harass annoy or alarm" that person.

And, by Cooper's own admission, there was probable cause to arrest him for criminal mischief under New York Penal Law § 145.00(1), for flicking off Jacobs' glasses, causing them to break, and thereby "intentionally damag[ing] the property of another person." Putting

31

Jacobs' false statement to one side, the objective evidence available to police on scene—Jacobs' visible injuries and broken glasses—could reasonably support the conclusion that Cooper committed any number of crimes.

Cooper alleges that his arrest was secretly motivated by a desire to protect Jacobs from punishment (App. Br. 25), but the subjective state of mind of the arresting officer at the time of an arrest is irrelevant. It is an objective view of the evidence available to that officer which determines whether there was probable cause. *See Whren v. United States*, 517 U.S. 806, 813 (1996). Indeed, even the arresting officer's own subjective belief that probable cause was lacking is irrelevant to the Court's determination. *United States v. Gagnon*, 373 F.3d 230, 239 (2d Cir. 2004).

Nor can Cooper prevail on his theory that police should have known that he was the victim and accepted his protestations of innocence (App. Br. 25). His guilt or innocence is not the issue; the question is whether police had an objective basis to suspect him of committing a crime when they arrested him and to continue to suspect him when they held him at the station. And that they did. Indeed, he testified that when he was questioned at the police station, he hadn't wanted to talk to the captain

and was waiting to talk to "higher-ups," so he did not tell "the full extent of the whole story" (JA689-91). He admits he chose not to supply police at the station who were investigating the incident reasons to disbelieve Jacobs' account. In any event, there is no "duty on the arresting officer to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest," so long as the officers do not deliberately disregard facts known to them. *Jocks*, 316 F.3d at 135-36.

Cooper points to surveillance footage that undermines Jacobs' account of being punched to the ground, but that video was not available to the arresting officers on the scene. It is only the facts known to police *at the time of arrest*, and not facts learned with the benefit of hindsight, that figure into the probable-cause equation. *Wesby*, 138 S. Ct. at 586. As Cooper does not allege that officers on the scene or at the precinct had any objective reason to disbelieve Jacobs and O'Connor, the fact that they received conflicting statements does not vitiate that probable cause to arrest Cooper existed.

Further, Cooper's false-arrest claim is defeated by his admission that he had marijuana on him that day. The probable-cause standard

33

page 40 of 46

does not require that the crime for which there was probable cause is the same as the one ultimately charged or even invoked during the arrest. *Devenpeck v. Alford*, 543 U.S. 146 (2004); *Jaegly v. Couch*, 439 F.3d 149, 153-54 (2d Cir. 2006). So long as probable cause to arrest existed for *some* offense, not necessarily the one charged, a false-arrest claim should be dismissed. *See Berg v. Kelly*, 897 F.3d 99, 111 (2d Cir. 2018).

At the police precinct, shortly after he arrived, Cooper was found to have marijuana on him—a fact that he admits (JA82, 688-89), and that is confirmed by an NYPD Property Voucher stating that police vouchered three marijuana cigarettes and two items of "paraphernalia" (rolling paper) (JA405). In 2016, this provided a basis to arrest him for "unlawful possession of marihuana" under New York Penal Law § 221.05 (1977) (*repealed* by Local Law 2021 ch. 92, § 15). From that point on, which was hours before any charges were filed against him and before, according to Cooper's own testimony, "they arrested [him]" (JA295-96, 691, 719), there was probable cause to arrest him for possession of marijuana, which independently defeats his false-arrest claim.

For this reason too, Cooper's argument on appeal that police falsely imprisoned him by holding him at the station for several hours after he

gave his statement is without merit (App. Br. 26). From the time police detained him on the street to the time he was released a few hours later, there were objective facts from which a reasonable officer could conclude that Cooper had committed at least one of several crimes—including assault, intentional property damage, and possession of marijuana.

The district court correctly granted summary judgment to the City defendants on the grounds that probable cause defeats his claims. On appeal, he has supplied no reason to disturb that finding. If there is any doubt, the individual City defendants are entitled, at a minimum, to qualified immunity.

## POINT II

### COOPER'S CONSPIRACY CLAIMS FAIL AS A MATTER OF LAW

The district court further correctly rejected Cooper's amorphous conspiracy claims—which, on appeal, he variously describes as a conspiracy to falsely arrest, detain, and prosecute him (App. Br. 26-27), to fabricate evidence against him, and to violate his due process rights (App. Br. 33). This claim fails at every turn.

At the outset, Cooper can only bring a conspiracy claim if this Court rejects his primary argument that Jacobs was operating under color of

35

law. Plaintiffs can allege claims under § 1983 if state officials conspired "with a private person" to violate their constitutional rights. *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119-20 (2d Cir. 1995). If Jacobs was operating in the scope of his employment and under color of state law, as Cooper alleges, then his conspiracy claim is barred by the "intracorporate conspiracy doctrine, which provides that the officers, agents and employees of a single corporate or municipal entity, each acting within the scope of his employment, are legally incapable of conspiring together." *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (internal quotation marks omitted); *see also Murphy v. City of Stamford*, 634 F. App'x 804, 805 (2d Cir. 2015).

If the Court finds—as it should—that Jacobs was acting as a "private person" and not under color of law when he and O'Connor beat up Cooper and allegedly lied about it, Cooper's conspiracy claim still fails as a matter of law. Cooper failed to raise a triable question of fact as to any of the elements of a § 1983 conspiracy claim: that is (1) an agreement between state actors and private persons, (2) to act together to inflict a constitutional injury, and (3) an overt act done in furtherance of that goal

36

and causing that injury. *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002).

Cooper failed to adduce any evidence whatsoever sufficient to support a finding that the police entered into an agreement with Jacobs to violate Cooper's Fourth Amendment rights. He suggests that there must have been a conspiracy because police did not promptly locate surveillance videos, when he was able to later locate such footage (App. Br. 31), and police only told him they were pressing charges against him after he insisted on pressing charges against Jacobs and O'Connor (App. Br. 32). But "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy," such as these, are insufficient, as are "diffuse and expansive allegations … unless amplified by specific instances of misconduct." *Ciambriello*, 292 F.3d at 325 (internal quotation marks omitted). Neither performing an unsuccessful video canvass, nor making the decision to charge a suspect after discussing criminal charges with individuals on both sides of an altercation are "specific instances of misconduct" that might allow a jury to conclude that police officers entered into an agreement with Jacobs to falsely arrest Cooper.

37

Cooper also failed to show "the *sine qua non* of a § 1983 action: the violation of a federal right." *Singer*, 63 F.3d at 119; *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails."); *McGee*, 568 F. App'x at 35 (same). As shown above, *see supra* Point I.C, Cooper's arrest, detention, and prosecution were supported by probable cause—whether based on Jacobs' claim Cooper hit him, Cooper's admission that he broke Jacobs' glasses, or his admitted possession of marijuana. His conspiracy claim fails for this reason as well.

On appeal, Cooper points to minor inconsistencies in the police paperwork concerning whether Jacobs was armed and whether Jacobs admitted to striking Cooper at the scene as proof of an agreement to violate his rights (App. Br. 29-31). But none of this establishes a conspiracy to falsely arrest him. At the very most, it might suggest that police agreed not to pursue charges against Jacobs for his part in the altercation. But Cooper has no constitutional right to have the police arrest another person. *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *Thompson v. Grey*, 385 F. App'x 54, 55 (2d

38

Cir. 2010) ("there is no cause of action for the state's failure to prosecute another person under section 1983"); *Overby v. Fabian*, No. 17-CV-3377 (CS), 2018 U.S. Dist. LEXIS 114525, at *38 (S.D.N.Y. July 10, 2018) (same, collecting cases). His claims of a conspiracy to *not arrest* Jacobs are not cognizable. The district court correctly granted summary judgment on Cooper's conspiracy claim in the City defendants' favor.

## CONCLUSION

This Court should affirm.

Dated:  New York, NY
        May 17, 2023

                        Respectfully submitted,

                        HON. SYLVIA O. HINDS-RADIX
                        *Corporation Counsel*
                        *of the City of New York*
                        Attorney for City Appellees


                        By:  *Elina Druker*
                        _____
                        ELINA DRUKER
                        Assistant Corporation Counsel

                        100 Church Street
                        New York, NY 10007
RICHARD DEARING           212-356-2609
REBECCA L. VISGAITIS      edruker@law.nyc.gov
ELINA DRUKER
    *of Counsel*

39

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 7,948 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____
ELINA DRUKER